[No. 71485-1. En Banc.]
Argued May 9, 2002.     Decided August 22, 2002.

BARBARA J. BELL, *Petitioner*, v. THE STATE OF WASHINGTON, *Respondent*.

*Kenneth E. Petty* and *Lisa K. Wiese* (of *Williams, Kastner & Gibbs, L.L.P.*); *Janet L. Rice* (of *Schroeter, Goldmark & Bender, P.S.*); *William T. Cornell* (of *Cornell, Paris & Dean*); and *Mark Leemon*, for petitioner.

*Christine O. Gregoire, Attorney General,* and *Michael P. Lynch, Senior Counsel,* and *Paul J. Triesch* and *Catherine Hendricks, Assistants,* for respondent.

*Debra L. Stephens* and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

SANDERS, J. — A plaintiff in a negligent parole supervision action must prove the inadequate supervision proximately caused the complained-of injuries.

Here Barbara Bell, abducted and raped by a sex offender on parole, sued the State of Washington for failing to use reasonable care to supervise the parolee. The jury found the State breached its duty to reasonably supervise but also found that breach was not a proximate cause of the injury. The Court of Appeals affirmed. We accepted review to consider whether the trial court erred when it (1) refused Bell's proposed jury instructions on the standard of proof and factors governing decisions on parole, (2) admitted testimony from a former member of the Indeterminate Sentence Review Board on the minimum standard of proof required to establish a parole violation at a revocation hearing, and (3) refused to admit into evidence a sexually explicit magazine found at the scene of the abduction.

## FACTS

Barbara Bell worked as a real estate agent in the Spokane area. In early October 1995 she received a phone call from Byron Scherf about a home she had listed in *Homes Magazine.* The house was in a remote location between Spangle and Cheney. Bell and Scherf agreed to meet the following day at the house. Although Scherf stated his wife would accompany him, Bell found Scherf waiting for her

alone when she arrived at the house. While Bell showed Scherf the master bedroom, he suddenly attacked her. Scherf grabbed Bell by the throat, choked her, and fell on top of her. Bell started screaming, but stopped when Scherf told her he would snap her neck if she continued. Scherf told Bell he had killed several women before and would not hesitate to kill her as well. Scherf grabbed Bell by the neck and took her to the kitchen, where he picked up a butcher knife. With the knife pressed against Bell's ribs, Scherf took her by the neck to the trunk of his car and made her get in. Scherf drove out into the woods, brought Bell out of the trunk, and raped her. Afterward, Scherf again threatened to kill Bell, but she managed to convince Scherf to release her without further harm by promising she would not report him to the police. Scherf took Bell back to the prospect house, where he set her free.

What Bell could not know when she agreed to meet Scherf at the remotely located house was that he was a two-time felon on parole for kidnapping, raping, and setting another woman on fire. In the late 70s Scherf was convicted of second degree assault and served 2 years of a 10-year prison term. He was paroled in the spring of 1980. While on parole, Scherf kidnapped a young waitress and brought her to an abandoned house where he bound and raped her. Scherf then poured gasoline over the waitress, lit it, and left. The waitress survived by wriggling, still bound, through a second-story window. Her fall was broken by a veranda porch, after which she managed to free herself and call for help. It was for this conviction Scherf was on parole when he attacked Bell.

His parole began on December 30, 1993, approximately two years before this attack. Among the original conditions of release were that Scherf obey all laws, report regularly to his community corrections officer (CCO), complete inpatient chemical or mental-health counseling, submit to periodic polygraph examinations on matters related to conformity with parole conditions and sexual deviancy, register as a sex offender, and obtain approval from his CCO for all living, employment, and educational arrangements.

Following release Scherf lived with his wife, whom he had married while in prison, and attended Eastern Washington University. Initially Scherf substantially complied with these original parole conditions, but three months into his parole he told his CCO Steven Holmes about his sexual addiction and use of pornography. At a polygraph examination, during the same period, Scherf also admitted to using sex shops, including masturbating in film booths at least twice, "for his own version of intervention for his sexual deviant fantasies and feelings . . . ." Ex. D-220A, at 2-3.

Concerned about Scherf's potential to violently reoffend, CCO Holmes reported Scherf's admissions to the Indeterminate Sentence Review Board (ISRB). At Holmes' recommendation the ISRB imposed additional conditions on Scherf's parole, including prohibitions against driving without prior CCO authorization, against picking up "any strangers while operating a motor vehicle," and against possession of "hardcore/illegal or violent pornography." Ex. P-140; D-223.

Scherf continued to use sexually explicit materials. At one point he admitted to his CCO that he had bought a *Playboy* magazine within the past two months. Although Scherf's parole was conditioned on his consent to searches of his personal belongings, none of the three CCOs[1] assigned to supervise Scherf throughout his parole conducted such a search to determine whether the material Scherf admitted possessing was of the kind prohibited by the additional conditions.

Bell filed this action in the Spokane County Superior Court against the State alleging her injuries were the result of its negligent supervision of Scherf.[2] She claims had Department of Corrections (DOC) adequately supervised

---

[1] In addition to Scherf's original CCO Steven Holmes, after Holmes' promotion to other duties, CCO Bowerman followed by CCO Vandemark worked on Scherf's case.

[2] Bell also named as defendants two counselors who treated Scherf, but these claims were apparently settled before trial. Clerk's Papers (CP) at 11; Br. of Appellant at 2; *Bell v. State*, noted at 106 Wn. App. 1047, 2001 WL686586, at *2 n.1.

Scherf, he would not have had the opportunity to attack her because adequate supervision would have discovered parole violations by Scherf which would have justified restrictive measures to limit Scherf's freedom.

Bell called William Stough, a former parole official, as an expert to testify about what he considered inadequate supervision of Scherf. According to Stough, Scherf's conduct on parole was troublesome from the very beginning and resulted in several parole violations. In particular, Stough opined Scherf's masturbating in film booths violated the original condition of his parole that Scherf obey all laws.[3] Bell also called Dr. Irwin Dreiblatt, an experienced psychologist specializing in sexual offenses. Dr. Dreiblatt opined that in light of Scherf's history of sexual assaults and his conduct on parole, his CCOs should have recommended to the ISRB that Scherf's parole be revoked.

The State's theory of defense has consistently been that there was nothing DOC realistically could have done to prevent Scherf's attack. According to the State Scherf was in substantial compliance with his parole conditions until he raped Bell, and the only potential violations of parole known to DOC were timely reported to the ISRB. The State points out Scherf's admitted use of sexually explicit materials and his frequenting of sex shops were reported to the ISRB, which decided not to revoke his parole or even hold a revocation hearing.

To counter Bell's suggestions that Scherf's parole would have been revoked but for DOC's inadequate supervision, the State called former ISRB member David Carlson who explained how the ISRB decides whether to hold a parole revocation hearing. He testified mere admissions of parole violations, such as Scherf's admitted masturbation in film booths in possible violation of a local lewd conduct ordinance, are insufficient to even commence a revocation hearing as the ISRB requires some corroboration before deciding to hold a hearing, let alone revoke parole.

---

[3] Arguably, Scherf's masturbating in film booths may have constituted lewd conduct in violation of Spokane Municipal Code 10.06.020.

Carlson also testified about the decision-making process at revocation hearings. He stated an alleged parole violation must be established with an 85 to 90 percent certainty before the ISRB would take action. Bell objected and moved to strike, noting that not only was Carlson's opinion testimony an incorrect statement of the law[4] but since the matter was a question of law, opinion testimony would be impermissible. The court granted the motion in part, but nevertheless allowed Carlson to testify as to his understanding of the applicable standard of proof.

The standard of proof at revocation hearings reappeared during the subsequent testimony of another former ISRB member, Katherine Bail. Seemingly contradicting Carlson's testimony that the ISRB is looking for something in the 85 to 90 percent range, Bail testified the standard of proof is a preponderance standard. At the conclusion of the trial Bell proposed the jury be instructed on the standard of proof so as to clear up any lingering confusion on the jury's part (Bell's proposed instruction 12).[5] The trial court rejected the instruction citing the ISRB's discretion not to revoke parole even if a parole violation has been established by a preponderance of the evidence. Therefore, according to the court, Bell's proposed instruction 12 "is not a formal predictor of what the Board will do" and would not help the jury. Report of Proceedings (RP) at 666.

Bell also proposed two instructions intended to supplement the court's general instructions. Bell's proposed instructions 11 and 13[6] purportedly set forth factors the ISRB

---

[4] The standard of proof is a preponderance of the evidence. RCW 9.95.125.

[5] Bell's proposed instruction 12 read, "Standard of proof at a hearing to revoke parole is a preponderance of the evidence." CP at 83.

[6] Bell's proposed instruction 11 read:

A statute of the State of Washington [RCW 9.95.100] provides:

Any convicted person undergoing sentence in the penitentiary or the reformatory, not sooner released under the provisions of this chapter, shall, in accordance with the provisions of law, be discharged from custody on serving the maximum punishment provided by law for the offense of which such person was convicted, or the maximum term fixed by the court where the law does not provide for a maximum term. The board shall not, however,

must employ when determining whether to revoke parole. The trial court rejected these instructions as well. Referring to the ISRB's discretion not to revoke parole even if a violation has been established, the court concluded it would not be helpful for the jury to know what factors the ISRB considers when deciding whether to grant parole in the first instance.[7]

At trial Bell also offered into evidence a sexually explicit magazine found near a driveway at the prospect house the day after she was abducted. Bell offered the magazine "Chubby Chaser," Ex. P-149B, to prove what Scherf's CCOs allegedly would have discovered by, for example, searching his belongings after he admitted to possessing sexually

---

until his maximum term expires, release a prisoner, unless in its opinion his rehabilitation has been complete and he is a fit subject for release.

CP at 82.

Bell's proposed instruction 13 read:

A statute of the State of Washington provides in pertinent part as follows: Sub (2) and [[]3[]] of RCW 9.95.009

(2) After July 1, 1984, the board shall continue its functions with respect to persons convicted of crimes committed prior to July 1, 1984, and committed to the department of corrections. When making decisions on duration of confinement, including those relating to persons committed under a mandatory life sentence, and parole release under RCW 9.95.100 and 9.95.110, the board shall consider the purposes, standards, and sentencing ranges adopted pursuant to RCW 9.94A.040 and the minimum term recommendations of the sentencing judge and prosecuting attorney, and shall attempt to make decisions reasonably consistent with those ranges, standards, purposes, and recommendations: PROVIDED, That the board and its successors shall give adequate written reasons whenever a minimum term or parole release decision is made which is outside the sentencing ranges adopted pursuant to RCW 9.94A.040. In making such decisions, the board and its successors shall consider the different charging and disposition practices under the indeterminate sentencing system.

(3) Notwithstanding the provisions of subsection (2) of this section, the indeterminate sentence review board shall give public safety considerations the highest priority when making all discretionary decisions on the remaining indeterminate population regarding the ability for parole, parole release, and conditions of parole.

CP at 84.

[7] Bell did not except to the instructions the trial court actually gave, only to the court's failure to give her proposed instructions 11 through 13. Bell initially excepted to the court's refusal to give her proposed instruction 10 (relating to the crime of lewd conduct) as well, but the court eventually gave a substituted version of that instruction based on Bell's proposed instruction 10A.

explicit materials. According to Bell, this magazine provided the corroboration Carlson testified was required to hold a parole revocation hearing based on a parolee's admitted parole violation. The trial court declined to admit the magazine because it could not be connected to Scherf. The magazine did not have Scherf's fingerprints, nor could Bell provide a witness who had even seen the magazine in Scherf's possession. The court concluded the magazine was not relevant, and even if it were, its probative value was outweighed by its prejudicial effect.

The jury returned a verdict specially finding the State had failed to reasonably supervise Scherf but this breach of duty did not proximately cause the damage Bell suffered. The court entered judgment for the State and awarded costs.

On appeal Bell assigned error to the trial court's refusal to give her proposed jury instructions 11 through 13. Bell also assigned error to the trial court's decision to allow former ISRB member David Carlson to testify as to his understanding of the standard of proof at parole revocation hearings. Lastly, Bell claimed the trial court erred when it refused to admit the magazine found at the scene of Bell's abduction. The Court of Appeals affirmed in an unpublished opinion. *Bell v. State*, noted at 106 Wn. App. 1047, 2001 WL686586, at *1. We granted review.

## DISCUSSION

### I

### Whether the Trial Court Erred When It Refused Bell's Proposed Instructions

As set forth above, while Bell did not except to the instructions the trial court gave in this case, she did propose additional instructions. Bell's proposed instructions 11 through 13 set forth the standard of proof and factors pertaining to decisions to grant parole. Bell argues the court erred when it refused these instructions.

■ Jury instructions are adequate if they allow each party to argue its theory of the case to the jury, are not misleading, and when read as a whole properly inform the jury of the applicable law. *Farm Crop Energy, Inc. v. Old Nat'l Bank of Wash.*, 109 Wn.2d 923, 933, 750 P.2d 231 (1988). Without exception the court gave the following general negligence and proximate cause instructions:

### Instruction No. 7

The plaintiff has the burden of proving each of the following propositions:

First, that the defendant acted, or failed to act, in one of the ways claimed by the plaintiff and that in so acting, or failing to act, the defendant was negligent;

Second, that the plaintiff was injured;

Third, that the negligence of the defendant was a proximate cause of the injury to the plaintiff.

. . . .

Clerk's Papers (CP) at 99.

### Instruction No. 9

Negligence is the failure to exercise ordinary care. It is the doing of some act which a reasonably careful person would not do under the same or similar circumstances or the failure to do something which a reasonably careful person would have done under the same or similar circumstances. Ordinary care means the care a reasonably careful person would exercise under the same or similar circumstances.

CP at 101.

### Instruction No. 10

The State of Washington has a duty to take reasonable precautions to protect anyone foreseeably endangered by the dangerous propensities of persons on parole.

CP at 102.

### Instruction No. 11

The term "proximate cause" means a cause which in a direct sequence produces the injury complained of and without which such injury would not have happened.

There may be more than one proximate cause of the same alleged injury. If you find that the defendant was negligent and that such negligence was a proximate cause of injury or damage to the plaintiff, it is not a defense that the act of some other person may also have been a proximate cause.

CP at 108.

Had the court accepted Bell's proposed instructions 11 through 13, the jury would also have been instructed on what Bell claimed to be "matters pertaining to the law concerning parole." RP at 662. Bell's proposed instructions 11 and 13 were based on RCW 9.95.100 and RCW 9.95.009 respectively.

■■■ If an instruction sets forth the language of a statute, it is appropriate only if the statute is applicable, reasonably clear, and not misleading. *See State v. Goree*, 36 Wn. App. 205, 208, 673 P.2d 194 (1983); *Day v. Goodwin*, 3 Wn. App. 940, 944, 478 P.2d 774 (1970). Admittedly, Bell's proposed instructions 11 and 13 state the language of RCW 9.95.100 and RCW 9.95.009(2)-(3) respectively. But these two statutes govern decisions by the ISRB on whether to initially release an inmate on parole and, if so, under what conditions. They are not applicable to parole revocation. *Cf.* WAC 381-70-010 (setting forth the purpose of chapter 381-70 WAC to "specify policies and procedures relating to parole revocation hearings"); WAC 381-70-030(4) (setting forth factors the ISRB will consider when "making a parole revocation or reinstatement decision"). Since Bell's proposed instructions 11 and 13 were based on instructions that do not apply to parole revocation, let alone negligent parole supervision actions, it was not error to refuse them.

Bell also proposed a jury instruction on the standard of proof at parole revocation hearings. Referenced as Bell's proposed instruction 12, it provided: "Standard of proof at a hearing to revoke parole is a preponderance of the evidence." CP at 83. While this instruction is a correct state-

ment of the standard of proof,[8] the trial court nonetheless properly rejected Bell's proposed instruction 12 because it pertains to irrelevant matters. The preponderance of evidence standard in this instruction does not prove causation of damages brought about by a parolee because the ISRB may decline to revoke parole or otherwise restore the parolee's liberty even if a violation is established. *See* RCW 9.95.125 (granting the ISRB discretion not to revoke parole even if parole violations are proved to it by a preponderance of the evidence).

The standard of proof at revocation hearings is not relevant to prove negligent supervision because DOC's duty to supervise parolees exists independently of any actions that might be taken by the ISRB. *See Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 83, 1 P.3d 1148 (2000) (citing *Bishop v. Miche*, 137 Wn.2d 518, 526, 973 P.2d 465 (1999)). Nor is it relevant to proximate cause because even if the standard is met the ISRB has discretion to continue parole. *See* RCW 9.95.125.

In *Tyner* we noted, "the duty of CPS [Child Protective Services] workers to investigate exists apart from any action which might be taken by a court." 141 Wn.2d at 83.[9] Likewise, the duty of community corrections officers to monitor, investigate, and report potential parole violations exists independently of any action that might be taken by the ISRB. *See* RCW 72.04A.080 (placing parolees in the supervision of DOC); RCW 72.04A.090 (charging DOC with the duty to report to the ISRB conduct by parolee in violation of parole conditions); *Bishop*, 137 Wn.2d at 525-26 (holding duty to supervise includes the duty to monitor and report noncompliance with release conditions). DOC is charged with the duty to reasonably supervise each parolee regardless of whether the ISRB declines to revoke parole

---

[8] *See* RCW 9.95.125; *Pierce v. Dep't of Soc. & Health Servs.*, 97 Wn.2d 552, 646 P.2d 1382 (1982); *State v. Dupard*, 93 Wn.2d 268, 609 P.2d 961 (1980).

[9] *Tyner* was heavily based on our prior decisions in the area of negligent supervision, *Bishop v. Miche*, 137 Wn.2d 518, 973 P.2d 465 (1999); *Hertog v. City of Seattle*, 138 Wn.2d 265, 979 P.2d 400 (1999). *See Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 84-86, 1 P.3d 1148 (2000).

even if a parole violation is established. The State's liability stems from failure to perform this supervisory duty by either failing to discover or concealing information material to a decision by the ISRB. *See Bishop*, 137 Wn.2d at 526 (noting the duty to supervise is premised on "the failure to adequately monitor and report violations") (emphasis omitted); *Hertog v. City of Seattle*, 138 Wn.2d 265, 283, 979 P.2d 400 (1999) (noting the fact that the supervising officer "did not actually know of probation violations does not answer the question whether he should have known of any such violations").

■ A plaintiff in a negligent parole supervision action must show not only inadequate supervision, but must also carry the burden to demonstrate the damage sustained by the plaintiff would have been avoided but for the inadequate supervision. This is a fact question properly presented to the jury.

## II

## Whether the Trial Court Erred by Allowing Opinion Testimony on the Standard of Proof at Parole Revocation Hearings

Bell also assigns error to the trial court's decision to allow former ISRB member Carlson to testify about the standard of proof at parole revocation hearings. Carlson opined:

> Burden of proof is described as more reasonable to believe than not to believe. If you look at probable cause as being 51 percent, just over, we would—as Parole Board we were looking at somewhere in the 85 to 90 percent.

RP at 363. The court sustained an objection from Bell, but nevertheless allowed Carlson to testify as to his understanding of the applicable standard of proof.

■ To that extent, the trial court's ruling is error. Opinion testimony on legal issues is not admissible. *King County Fire Prot. Dist. No. 16 v. Housing Auth.*, 123 Wn.2d 819, 826, 872 P.2d 516 (1994) (citing *Wash. State Physicians Ins.*

*Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 344, 858 P.2d 1054 (1993); *Parkin v. Colocousis*, 53 Wn. App. 649, 653, 769 P.2d 326 (1989)). The Court of Appeals upheld the trial court by suggesting "Mr. Carlson did not presume to interpret the applicable statute, [RCW 9.95.125]." *Bell*, noted at 106 Wn. App. 1049, slip op. at 10, 2001 WL 686586, at *4.

> The opinion was based on Mr. Carlson's experience as a former [ISRB] member and may have been helpful to the determination of the [ISRB's] role in a revocation hearing. ER 701. Additionally, the impact of his unclear testimony was lessened by the testimony of another former [ISRB] member, who clearly stated that the standard of proof was preponderance of the evidence.

*Id.* at slip op. 10, *5.

It matters little if the opinion is stated vaguely or clearly; if it refers to a legal issue within the court's purview, it is inadmissible. We disagree with the Court of Appeals' reasoning that the impact of this ambiguity "was lessened by the testimony of another former board member [Katherine Bail], who clearly stated the standard of proof was preponderance of the evidence." *Id.* The impact of improper opinion testimony on a legal issue is not cured by opinion testimony of another witness on the same legal issue. Two wrongs do not make a right.

Ultimately, however, the standard of proof at parole revocation hearings is not relevant to establish negligent supervision, nor does the standard tell us when the ISRB will revoke parole. The error was harmless because it is not logically linked to the ultimate fact to be decided by the jury. *See* Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 GONZ. L. REV. 277, 298 (1995-96); *Cobb v. Snohomish County*, 86 Wn. App. 223, 236, 935 P.2d 1384 (1997); *Beeson Bros. v. Chambers*, 155 Wash. 564, 575, 285 P. 433 (1930).

## III

### Exclusion from Evidence of Magazine Found at the Scene of Bell's Abduction

Lastly, Bell argues the trial court erred when it refused to admit Ex. P-149B, the magazine discovered at the scene of her abduction. Most of Bell's arguments with respect to the magazine are focused on its authenticity under ER 901. As such, they are premised on the assumption the magazine is relevant in the first place. But the trial court excluded the magazine on relevancy grounds, not authenticity.

> THE COURT: . . . . [T]he basic premise that this material was found on the road simply does not have the requisite identity with Mr. Scherf. And I don't mean identity in terms of criminal proof of identity. I just simply can't draw the conclusion based on there is no evidence that he in any other context used this particular magazine. There is no other evidence of anyone seeing the magazine in the vehicle, there is no evidence of anyone seeing the magazine fall out of his vehicle and just its sheer presence on a road is not enough to satisfy the requirements of Rule 401 with regard to minimal relevancy.
>
> . . . .
>
> THE COURT: Let the record show that the Court has now ruled that the document that was found on the road was not relevant, and even if relevant is outweighed by 403 prejudice.

RP at 385-87.

The threshold issue for admission of any evidence is relevancy. Only relevant evidence is admissible. ER 402. "Evidence is relevant if it has a tendency to make the existence of any fact of consequence more probable or less probable than it would be without the evidence." *State v. Darden*, 145 Wn.2d 612, 624, 41 P.3d 1189 (2002) (citing ER 401). Even if relevant, however, evidence may still be excluded if its probative value is substantially outweighed by unfair prejudice, confusion, or undue delay. ER 403. A trial court's relevancy determinations, including its balancing of probative value against unfair prejudicial effects, are

generally reviewed for manifest abuse of discretion. *State v. Russell*, 125 Wn.2d 24, 78, 882 P.2d 747 (1994).[10]

Although the threshold for relevancy is low, *Darden*, 145 Wn.2d at 621, the magazine found at the scene of Bell's abduction cannot reach even that level. It was not established as *Scherf*'s magazine; at most it is *a* magazine that *might* have been possessed by Scherf. To be relevant, evidence need not establish the proponents' case or theory in and of itself, but it must be at least a piece of the puzzle. Because the magazine found at the scene of Bell's abduction was not connected to Scherf, the trial court did not abuse its discretion by refusing to admit it.[11]

---

[10] Bell urges us to review the trial court's decision de novo based on the reasoning in *Jenkins v. Snohomish County Pub. Util. Dist. No. 1*, 105 Wn.2d 99, 713 P.2d 79 (1986) and *State v. Karpenski*, 94 Wn. App. 80, 971 P.2d 553 (1999). However, *Jenkins* and *Karpenski* reviewed competency determinations and the approach taken there does not translate to the realm of relevancy. While testimonial competency is determined without consideration of how the witness' testimony relates to the remaining evidence in the case, the same is not true with relevance. As the definition of relevant evidence makes evident, relevance determinations are made by determining whether a proffered piece of evidence is "of consequence to the determination of the action." ER 401. This is a gestalt determination with discretion as its main constituent. *Id.* That principle is even stronger with regard to ER 403 since that rule "clearly vests the trial judge with discretion in weighing the probative value of evidence against the factors listed in the Rule." ROBERT H. ARONSON, THE LAW OF EVIDENCE IN WASHINGTON at 403-4 (3d ed. 2001). This is apparent, among other things, from the different language in the rules. Under ER 402, "[a]ll relevant evidence *is* admissible," (emphasis added) wherefore the trial court's discretion is limited to the relevancy determination. Under ER 403, however, evidence "*may* be excluded" (emphasis added) even if relevant, which indicates discretion on the part of the trial court even after having determined the evidence relevant. *See Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 28, 978 P.2d 481 (1999) (noting the term "may" is permissive). We therefore decline to apply the *Jenkins* approach under these circumstances.

[11] Since the magazine was not even minimally relevant, we need not reach the trial court's ER 403 determination.

As for Bell's authenticity argument, we fail to see how ER 901 could be used to authenticate the copy of the "Chubby Chaser" as belonging to Scherf. ER 901 might have been applicable if a witness had seen a copy of the "Chubby Chaser" in Scherf's possession at some point prior to his abduction of Bell. In that situation, the issue would have been whether Ex. P-149B was the copy of "Chubby Chaser" seen in Scherf's hand. But that is not the situation here.

## CONCLUSION

In this factual context, a plaintiff in a negligent parole supervision action must prove that but for the lack of supervision a parole violation would have been discovered,[12] and that the inadequate supervision proximately caused the plaintiff's injury. This plaintiff established the supervision was inadequate to the jury's satisfaction but failed to prove that negligent supervision was a proximate cause of her injuries. She therefore did not carry her burden under the jury instructions properly given. The trial court's refusal to give Bell's proposed instructions 11 through 13 was not error. The court did err by allowing opinion testimony on the standard of proof at parole revocation hearings, but this error was harmless because that standard of proof does not properly measure proximate cause. Lastly, the trial court did not err when it refused to admit a magazine found at the scene of Bell's abduction since it could not be connected to Scherf.

The judgment of the trial court is affirmed and the State shall recover its costs.

ALEXANDER, C.J., and SMITH, JOHNSON, MADSEN, IRELAND, BRIDGE, CHAMBERS, and OWENS, JJ., concur.

Reconsideration denied October 16, 2002.

---

[12] *See Tyner*, 141 Wn.2d at 86 (holding negligent investigation of alleged child abuse "may be the proximate cause of injury where the State has failed to supply sufficient material information" to a court issuing an order prohibiting a parent from contacting his or her child); *Taggart v. State*, 118 Wn.2d 195, 227, 822 P.2d 243 (1992) (declining to hold cause in fact could not be established as a matter of law because a reasonable jury might conclude injury would not have occurred had a parole warrant been issued based on known parole violations); *Hertog*, 138 Wn.2d at 283 (declining to hold cause in fact could not be established as a matter of law because it was unclear whether the probationer was in compliance with his probation conditions); *Bishop*, 137 Wn.2d at 531-32 (holding chain of causation between supervision of probationer and fatal accident caused by that probationer was broken by court's decision not to revoke probation because court had all material information before it, including probationer's violation of release conditions).